**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON**

ARVILLE SARGENT,

      Movant,

v.                                                      **Case No. 2:14-cv-27712**
                                                        **Case No. 2:13-cr-00050**

UNITED STATES OF AMERICA,

      Respondent.

## PROPOSED FINDINGS AND RECOMMENDATION

Pending before the Court is Movant's Motion to Vacate, Set Aside, or Correct Sentence, pursuant to 28 U.S.C. § 2255 (ECF No. 73, Motion to Vacate, Set Aside or Correct Sentence).  This matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

## PROCEDURAL HISTORY

On February 12, 2013, Movant, Arville Sargent (hereinafter "Defendant"), was charged in a two-count information with one count of aiding and abetting honest services mail fraud, in violation of 18 U.S.C. §§ 1341, 1346,  and 2, and one count of attempting to evade or defeat tax under 26 U.S.C. § 7201.  (ECF No. 1).  Throughout his district court proceedings, Defendant was represented by retained counsel, Troy N. Giatras.

On January 14, 2013, Defendant executed a written plea agreement in which he agreed to plead guilty to both counts of the information. (ECF No. 13). As noted by Respondent, the plea agreement included the following acknowledgement:

> I hereby acknowledge by my initials at the bottom of each of the foregoing pages and by my signature on the last page of this twelve-page agreement that I have read and carefully discussed every part of it with my attorney, and that I understand the terms of this agreement, and that I voluntarily agree to those terms and conditions set forth in the agreement. I further acknowledge that my attorney has advised me of my rights, possible defenses, the Sentencing Guideline provisions, and the consequences of entering into this agreement, that no promises or inducements have been made to me other than those in this agreement, and that no one has threatened me or forced me in any way to enter into this agreement. Finally, I am satisfied with the representation of my attorney in this matter.

(*Id.* at 12). The plea agreement also contained a stipulation of facts and a proposed agreement setting the total adjusted sentencing guideline offense level at either 27 or 29, before acceptance of responsibility. (*Id.* at 23-28, Ex. B). However, the parties reserved the right to litigate whether the loss figure was above or below $7 million. (*Id.* at 9). The written plea agreement contained an express waiver of direct appeal (excluding the appeal of a guideline level outside of 24-29), and for post-conviction collateral attack, except for any claim based upon ineffective assistance of counsel. (ECF No. 13). Defendant signed and initialed each page of the plea agreement, and initialed each page of the stipulation of facts. (*Id.* at 1-12, 23-28).

On March 27, 2013, Defendant waived indictment and pled guilty, pursuant to the written plea agreement, to both counts of the information. (ECF Nos. 11-14). The District Court conducted a thorough plea colloquy in accordance with Rule 11 of the Federal Rules of Criminal Procedure, including receiving Defendant's own factual basis for his guilty plea, the government's proffer of evidence to support the essential elements of Counts

One and Two, and Defendant's acknowledgement of the rights he was waiving and his satisfaction with his attorney's representation.  (ECF No. 27).

Forfeiture proceedings were also instituted, and on June 28, 2013, the district court entered a Final Order of Forfeiture concerning $415,000.  (ECF No. 31).  An Amended Final Order of Forfeiture was entered on July 8, 2013.  (ECF No. 33). Defendant's sentencing hearing was also continued several times, upon motions of both the government and Defendant.

On October 11, 2013, Defendant appeared for sentencing.  During the sentencing hearing, both parties presented evidence and argument about whether the total loss figure was above or below $7 million.  Ultimately, the district court concluded that a 20-level increase was warranted under USSG § 2B1.1(b)(1)(K), based upon a loss figure in excess of $7 million.  (ECF No. 46 at 134).  Accordingly, the court determined that Defendant's total offense level was 26, with a criminal history category of I, and sentenced Defendant to 72 months of imprisonment on Count One and a concurrent term of imprisonment of 60 months on Count Two, followed by a three-year term of supervised release.  (*Id.* at 149-150).

Defendant appealed his sentence to the United States Court of Appeals for the Fourth Circuit, asserting a claim of ineffective assistance of counsel.  On appeal, Defendant was represented by court-appointed counsel, Christopher P. Keleher.  The Fourth Circuit affirmed the judgment of the district court by unpublished per curiam opinion, which stated, "[b]ecause none of Sargent's alleged ineffective assistance of counsel claims conclusively appear on the record, we decline to address them in this appeal." *United States v. Sargent*, No. 14-4098, 582 F. App'x 197 (4th Cir. Aug. 25, 2014).

Defendant did not file a petition for a writ of certiorari in the United States Supreme Court.

On December 1, 2014, Defendant filed the instant section 2255 motion (ECF No. 73), which includes Defendant's motion and a brief in support thereof. Although the claims raised in the motion and brief are somewhat inconsistently pled, the undersigned has construed the section 2255 motion to be asserting the following grounds for relief:

    A.    Ineffective assistance of counsel.

           1.    Ineffective assistance of counsel during plea negotiations.
           2.    Ineffective assistance of counsel during presentence investigation
           3.    Ineffective assistance of counsel at sentencing.

    B.    The prosecution presented perjured testimony at sentencing.

    C.    The presiding District Judge had a conflict of interest.

(ECF No. 73, *passim*).

On June 26, 2015, pursuant to the undersigned's Order, Defendant's defense counsel, Troy N. Giatras, filed an Affidavit responding to Defendant's grounds for relief. (ECF No. 90). On July 27, 2015, Respondent (hereinafter "the Government") filed a Response to the section 2255 motion asserting that Mr. Giatras provided effective assistance at all pertinent stages of Defendant's criminal proceedings. (ECF No. 92). Accordingly, the Government requests that Defendant's section 2255 motion be denied and this matter be dismissed. (*Id.*) On August 24, 2015, Defendant filed two reply briefs. (ECF Nos. 93 and 94). This matter is ripe for adjudication.

## ANALYSIS

### A.    Ineffective Assistance of Counsel Claims.

The Supreme Court addressed the right to effective assistance of counsel as guaranteed by the Sixth Amendment in *Strickland v. Washington*, 466 U.S. 668 (1984), in which the Court adopted a two-pronged test.  The first prong is competence; movant must show that the representation fell below an objective standard of reasonableness.  *Id.* at 687-91.  There is a strong presumption that the conduct of counsel was in the wide range of what is considered reasonable professional assistance, and a reviewing court must be highly deferential in scrutinizing the performance of counsel.  *Id.* at 688-89.

> In order to meet the first prong, movant must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.  The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Id.* at 690.  This inquiry is directed at whether defense counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  *Harrington v. Richter*, 562 U.S. 86, 105 (2011).  As noted by Respondent, "[t]he question is whether counsel made errors so fundamental that counsel was not functioning as the counsel guaranteed by the Sixth Amendment."  *Id.* at 88.  (ECF No. 113 at 6).

The second prong is prejudice; "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  The court may determine the

prejudice prong prior to considering the competency prong if it is easier to dispose of the claim on the ground of lack of prejudice.  *Id.* at 697.  Using this standard, the undersigned will address each claim of ineffective assistance of counsel asserted by Defendant.

### 1.    Ineffective assistance during plea negotiations.

Defendant alleges that his plea negotiations were defective because Mr. Giatras did not thoroughly discuss the plea agreement with him; that during the pendency of the plea negotiations, Mr. Giatras communicated with Defendant by telephone because he was traveling in China; and that Defendant executed the plea without his counsel being present.  Defendant further appears to assert that his plea agreement was coerced because Mr. Giatras encouraged him to plead guilty to avoid further prosecution of other family members, including his wife and son.  (ECF No. 73 at 4-5).

The Government's Response, as supported by Mr. Giatras' Affidavit, confirms that Mr. Giatras did communicate, via Skype, with Defendant about the plea agreement while Mr. Giatras was in China.  (ECF No. 90 at 2; ECF No. 92 at 7).  However, the Response and Affidavit further indicate that, between August of 2012, when Defendant retained Mr. Giatras's firm, and January 15, 2013, when the plea agreement and stipulation of facts were fully executed, Mr. Giatras engaged in numerous substantive discussions with Defendant, both in person and by e-mail, and "worked closely with defendant in reviewing and revising the plea agreement and related documents multiple times."  (ECF No. 90 at 2; ECF No. 92 at 8).[1]  Respondent asserts that "[i]n fact, Defendant was very involved in

---

[1]  Mr. Giatras' Affidavit details various in person meetings he and his associates conducted with the defendant and various e-mails and telephone calls in which the allegations, evidence, and proposed plea and sentencing options were discussed with Defendant, alone, and with Defendant and the Government. (ECF No. 90).

the plea negotiation and review process" and that he "does not even specifically contend

otherwise." (ECF No. 92 at 8). The Government's Response further asserts:

> For the same reasons, defendant's claim that he signed the plea agreement
> without his counsel "present" (Motion at p. 2) is meritless. The fact that
> defendant signed the agreement without his counsel present does not
> establish ineffective assistance of counsel when defense counsel had
> discussed the plea agreement thoroughly with him. *Whiting v. Burt*, 395
> F.3d 602, 617 (6th Cir. 2005). Further, during the plea colloquy, the trial
> court asked defendant to verify his signature and initials on the agreement
> and the supporting factual stipulation (he did). (Plea Tr. at p. 36) [footnote
> omitted].

(ECF No. 92 at 8).

The Government further asserts that Defendant's claim that he was coerced to sign

the plea agreement in order to avoid prosecution of his relatives should also be rejected.

The Response further states:

> The district court's extensive inquiry during the plea colloquy establishes
> beyond question that defendant understood the offenses to which he was
> pleading guilty, the supporting factual stipulation, and the terms of the plea
> agreement. (Plea Tr. at pp. 11-12, 21, 30.) Defendant described in his own
> words his conduct underlying his offenses of convictions, concluding that
> "[he] knew what [he] was doing was wrong." (Plea Tr. at pp. 44-52). That
> is, he pleaded guilty, "voluntarily and of [his] own free will." (Plea Tr. at p.
> 43).

> Additionally, in answer to the district court's inquiry, defendant stated that
> his counsel, Mr. Giatras, "discussed thoroughly" with him the charges to
> which he was pleading guilty and "all possible defenses" to the charges, he
> had told his counsel "all the facts," he understood "everything" in the
> agreement and factual stipulation, and he approved of the agreement and
> factual stipulation "when it was reached" as well as at the plea hearing. (Plea
> Tr. at pp. 11, 30, 35-36). Further, defendant confirmed that he was satisfied
> with his attorney who had represented him "fully and fairly," and further
> explicitly denied that he had been threatened or coerced "in any way" to
> plead guilty. (Plea Tr. at p. 42).

> In light of his sworn statements made during this properly conducted Rule
> 11 colloquy, defendant's claims fall into the "palpably incredible" and
> "patently frivolous or false" category described in *United States v.
> LeMaster*, 403 F.3d 216, 219 (4th Cir. 2005) (quoting *United States v. White*,
> 366 F.3d 291, 296 (4th Cir. 2004)). That is, the truth of the defendant's

sworn statements during his plea hearing is "conclusively established." *Id.* at 222. Defendant cannot escape the record by simply asserting now, in a self-serving manner, that he was forced to answer the district court's questions affirmatively. (Motion at p. 3.) The Court should therefore summarily deny his § 2255 Motion relying on allegations contradicting these sworn statements – *i.e.*, all of his complaints pertaining to the plea negotiations.

(*Id.* at 9-10).

Defendant's replies summarily assert that Mr. Giatras failed to read any of the e-mails that were exchanged among Defendant, Mr. Giatras, and the Government, and that Mr. Giatras conducted no investigation of this matter prior to "brow beating [Defendant] into a plea that if he did not take would expose him to a 30-year term in prison and get his family placed in prison." (ECF No. 93 at 2; ECF No. 94 at 1).

In *Lafler v. Cooper*, 566 U.S. 156 (2012), the Supreme Court reiterated that the Sixth Amendment right to effective assistance of counsel applies during the plea negotiation stage of the criminal process. The Court confirmed that, "[i]n the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice." *Id.* at 163. Thus, a defendant who pled guilty must demonstrate that "there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

Furthermore, "[a]bsent clear and convincing evidence to the contrary, a defendant is bound by the representations he makes under oath during a plea colloquy." *Fields v. Attorney Gen.*, 956 F.2d 1290, 1299 (4th Cir. 1992); *see also Beck v. Angelone*, 261 F.3d 377, 396 (4th Cir. 2001) ("absent clear and convincing evidence to the contrary," defendant is bound by statements made under oath at Rule 11 hearing). Here, the plea colloquy demonstrates that Defendant was aware of the terms and conditions of the plea

agreement and his guilty plea, and Defendant acknowledged that he was knowingly and voluntarily entering into the same. He further acknowledged that he was fully satisfied with the performance and assistance of his counsel, and he has not demonstrated, by clear and convincing evidence, that he should not be bound by those representations.

As noted in the Government's Response, in *United States v. LeMaster*, 403 F.3d 216, 221 (4th Cir. 2005), the Fourth Circuit held that, absent extraordinary circumstances, a district court is not required to conduct an evidentiary hearing concerning a challenge to a guilty plea, where the defendant's allegations contradict the defendant's sworn statements made during a proper Rule 11 colloquy. Rather, the district court may find that such allegations are "palpably incredible" and "patently frivolous and false." *Id.*

In the instant matter, the undersigned proposes that the presiding District Judge **FIND** that Defendant's allegations of ineffective assistance of counsel during his plea negotiations are directly contradicted by his sworn statements during his plea colloquy, the truth of which are conclusively established. Accordingly, there is no basis for conducting an evidentiary hearing on these claims and, based upon the evidence of record, the undersigned proposes that the presiding District Judge further **FIND** that Defendant is not entitled to any collateral relief on his claims of ineffective assistance of counsel related to the plea process.

### 2. Ineffective assistance of counsel during presentence investigation phase.

Defendant further alleges that Mr. Giatras provided ineffective assistance of counsel because he did not attend Defendant's presentence interview with the probation officer. Defendant claims that both he and Mr. Giatras were notified of the date and time for Defendant's presentence investigation interview at the Probation Office. However,

when Defendant arrived to meet with Probation Officer Jeffrey Gwinn, Mr. Giatras was

not present and Mr. Gwinn stated that the interview could not proceed.  The section 2255

motion further states:

> After numerous attempts to contact this attorney Petitioner was told by Mr. [Gwinn] that his attorney would not be present this day and they would need to reschedule.  Mr. [Gwinn] then went on and asked the Petitioner numerous questions which Petitioner answered without benefit of an attorney.  This session was used for the Pre Sentence Report and no other meeting had ever taken place between the Petitioner, the Probation Officer, or Petitioner's attorney.

(ECF No. 73 at 5).

As noted in the Government's Response, Mr. Giatras states in his Affidavit that he

was unaware of the scheduled interview on June 27, 2013, and advised Mr. Gwinn that he

could only get background and financial information from Defendant and should not

discuss with Defendant his role in the offense or relevant conduct.  (ECF No. 90 at 4, ¶10;

ECF No. 92 at 10).  Thereafter, Mr. Giatras received copies of various communications

concerning the scheduling of the interview and documentation requested by the

Probation Officer for the interview and from the Government with respect to the loss

calculation.  (ECF No. 90, ¶¶ 11-12).

Mr. Giatras further stated that several telephone calls took place between himself

and Defendant, and himself and Mr. Gwinn, concerning the completion of financial

documents and 0ther documents needed for completion of the Presentence Report

("PSR") and about rescheduling the interview.  (*Id.*, ¶ 13).  On July 25, 2013, a conference

call occurred among Defendant, Mr. Giatras, and Mr. Gwinn to complete the presentence

interview.  That same date, Defendant met with Mr. Giatras' associate, Rachel Messer, to

complete the financial statements.  (*Id.*, ¶ 14).

The Government's Response asserts that these facts do not support a finding of deficient performance or any prejudice to Defendant's defense.  (ECF No. 92 at 10-11). Defendant's reply disputes that any follow-up interview occurred and that Mr. Giatras was not prepared at the sentencing hearing and had to take a 20 minute recess to "get [his] act together" and still had to "defer to his client due to the fact that he had no idea of any of the aspects of the case."  (ECF No. 93 at 3-4).

The undersigned proposes that the presiding District Judge **FIND** that Defendant has not demonstrated sufficient prejudice to support a claim of ineffective assistance of counsel based upon Mr. Giatras's failure to be present at the initial presentence investigation interview with the probation officer and, therefore, Defendant is not entitled to any collateral relief on this claim.

### 3.    Ineffective assistance of counsel at sentencing.

Defendant further asserts that Mr. Giatras "failed to properly investigate and introduce evidence at his sentencing hearing that would have completely changed his sentence structure." (ECF No. 73 at 9).  His section 2255 motion documents further state:

> Petitioner's attorney had Petitioner compose hundreds of pages of information at the attorney's request.  Petitioner's attorney had read none of this information that would have shown the court contradictory evidence other than what was given to the court by the government's one witness.  If the defense counsel would have investigated this information he could have shown the court how the dollar amounts given by the government were impossible to reach.  Defense counsel was instructed by Petitioner to bring to court a blackboard so he could show the court how Brickstreet and the compensation board structure their payments.  By doing so, it would have been clear to the court that the government and its witness were far off on their figures.

(*Id.*).

11

Defendant further asserts that Mr. Giatras failed to call Alan[2] Workman and Mike Greenleaf as defense witnesses at sentencing. Mr. Workman was a Certified Public Accountant ("CPA") whom Defendant asserts had been doing what Defendant was accused of doing for many years before Defendant was involved. Defendant claims that counsel could have shown that the scheme for which Defendant was convicted was actually that of Allen Workman. Defendant further contends that Mike Greenleaf, a former Workers Compensation CPA, could have demonstrated that it was impossible to reach a loss of over \$7.1 million as proposed by the Government. His motion documents further state:

> Mr. Greenleaf knows all of the Worker Compensation strategies and plans. This witness would have been crucial to Petitioner's defense and was willing to be called as a witness to give explanation to the court. After much argument with defense counsel, whose belief was this witness was not necessary, Petitioner knew his attorney was not looking after his best interests. This witness is an expert witness in this field and should have been allowed to speak on Petitioner's behalf. This witness could have performed a forensic accounting of all monies involved in this case and given a much different and much clearer objective view of what transpired in this case. These facts presented easily satisfy both prongs of the Strickland analysis.

(ECF No. 73 at 9-10).

The Government asserts that Defendant cannot establish deficient performance by Mr. Giatras resulting from the failure to call Allen Workman and Michael Greenleaf as witnesses at sentencing. First, the Government correctly contends that determining what witnesses to call in a particular case is a tactical decision generally left to counsel, even where the defendant disagrees. *See Strickland, supra,* 466 U.S. at 699; *see also United States v. Chapman,* 593 F.3d 365, 369 (4th Cir. 2010); *United States v. Terry,* 366 F.3d

---

[2] This individual's first name is spelled a variety of different ways in the documents filed in this matter. Because the stipulation of facts in Defendant's plea agreement spells Mr. Workman's name as "Allen," the undersigned will use that spelling herein.

312, 317-18 (4th Cir. 2004) (counsel's decision not to call certain witnesses was reasonable based upon his professional judgment); *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (the failure to call witnesses, even those who might offer mitigating evidence, is not ordinarily viewed as a lapse in professional judgment).  (ECF No. 92 at 12).  The Government's brief further states:

> Here, defense counsel made a tactical decision not to call Workman or Greenleaf as witnesses on defendant's behalf.  Defendant cannot show that this decision was not reasonable, especially when defendant and his counsel agreed that Workman's testimony would not have benefited him.  (Aff. at pp. 5-6.)  Further, defense counsel contacted Greenleaf about testifying, but Greenleaf declined.  *Id.*

> Moreover, defendant has failed to show what Workman's or Greenleaf's testimony would have been.  Defendant merely states that his counsel "could possibly have shown the scheme for which he was convicted of belonged to Alan [sic; Allen] Workman."  (Motion at 7.)  He provides no specifics.  *See Terry*, 366 F.3d at 316-18 (defendant's contention that he and other witnesses would have impeached the credibility of government witnesses, without the substance of the proposed testimony was inconclusive).  *See also United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) (a defendant who faults his attorney for not calling a witness cannot simply state the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance of counsel claim).

(*Id.* at 12-13).  The Government further contends that Mr. Giatras's cross-examination of the Government's witness, Jerome Edward Russell, demonstrates that it was not necessary to call these other witnesses.  (*Id.* at 13).  The Government asserts that Mr. Giatras "pushed Mr. Russell to admit to a lower loss amount."  (*Id.* at 14).

Defendant's replies assert that Workman and Greenleaf could have demonstrated that the loss amounts claimed by the Government were incorrect and impossible to reach by any calculations.  (ECF No. 93 at 4).  Defendant further contends that Mr. Greenleaf, in particular, could have aided in establishing the questionable credibility, or even falsity, of the loss calculations.  Defendant further disputes Mr. Giatras's statement that Mr.

Greenleaf refused to testify, claiming that this is an "outright lie" and that an evidentiary hearing should be held to "dispel this attorney's lies."  (ECF 94 at 2).

Here, Defendant's failure to specify what specific helpful testimony either Workman or Greenleaf could have provided is fatal to his claim.  *See Bassette v. Thompson* 915 F.2d 932, 940-41 (4th Cir. 1990) (defendant could not establish ineffective assistance of counsel on the general claim that witnesses should have been called).  The Government correctly notes that the determination of what witnesses to call "is a strategic decision 'demanding the assessment and balancing of perceived benefits against perceived risks, and one to which [w]e must afford . . . enormous deference.'"  *Thorne v. United States*, No. 1:16-cv-669, 2017 WL 1363312, *6 (E.D. Va. Apr. 12, 2017) (quoting *United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004)).  "To overcome this deference, a movant is required to provide facts establishing the particulars of what the uncalled witness would have said."  *Id.*  Defendant has wholly failed to provide such particulars.

For these reasons, the undersigned proposes that the presiding District Judge **FIND** that Defendant has not demonstrated that Mr. Giatras was ineffective in failing to call these particular witnesses and, thus, he is not entitled to any collateral relief on this claim.

Moreover, Defendant's contention in his section 2255 motion that Mr. Giatras was ineffective because he failed to object to the inclusion of restitution and forfeiture amounts in the loss calculation is misguided.  The loss calculation is a measure of the total amount of harm caused by the fraudulent scheme and is used to determine the offense level under the United States Sentencing Guidelines.  Restitution is the amount determined to be owed to the innocent victims of the scheme, which does not reduce the

total loss calculation. The same is true for forfeited assets. As noted in the Government's response:

> Loss relates to pecuniary harm that results, or was intended to result, from an offense. *See* USSG § 2B1.1 n.3. The amount of loss determines the specific offense characteristic applied to a defendant's guideline calculation for sentencing purposes. *See* USSG § 2B1.1(b). Restitution and forfeiture provisions, which exist in various federal statutes, compensate for a victim's loss, and provide for the seizure and forfeiture of assets that represent the proceeds of, or were used to facilitate, federal crimes, respectively. *See* USSG §§ 5E1.1 and 5E1.4. Restitution and forfeiture amounts are determined separately from the loss amount. Further, defense counsel took considerable time to argue the restitution and loss amounts, and he did so effectively. (Sentencing Tr. at pp. 12, 130-40.)

(ECF No. 92 at 17).

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Defendant has not demonstrated that Mr. Giatras's conduct fell below an objective standard of reasonableness for not objecting to the failure to subtract the restitution amounts from the loss calculation, and, at any rate, Defendant cannot demonstrate any prejudice therefrom.

Mr. Giatras's Affidavit further indicates that in preparation for the sentencing hearing, and the drafting and resolution of Defendant's objections to the PSR, he and his associate attended the sentencings of the various co-defendants and engaged in numerous discussions with the Government's attorney concerning the loss calculations, using agreed upon exhibits, and also prepared a sentencing memorandum arguing for a downward departure from the guideline sentencing range; however, the district court denied that request. (ECF No. 90 at 5-7, ¶¶ 17, 18, 23-29). As noted by the Government, Defendant has not established that Mr. Giatras's performance with respect to these sentencing issues was deficient, or that there is any reasonable probability that the

outcome of his proceedings would have been different absent the alleged errors asserted. (ECF No. 92 at 18).

Based upon an exhaustive review of the evidence of record, the undersigned proposes that the presiding District Judge **FIND** that Defendant has failed to demonstrate that Mr. Giatras provided ineffective assistance of counsel at the sentencing stage of his criminal proceedings and, thus, Defendant is not entitled to any collateral relief on these claims.

### B.    Alleged perjured testimony by Jerome Edward Russell.

Related to his claims of ineffective assistance of counsel at sentencing, Defendant specifically contends that the Government solicited perjured testimony from Jerome Edward Russell, in violation of his Fifth Amendment right, and that Mr. Giatras "did nothing to protect him from this perjury or false testimony." (ECF No. 73 at 6-9). More specifically, Defendant contends that Mr. Giatras's failure to object to or ask the court to strike this testimony "could not be the result of professional judgment." (*Id.* at 8-9).

The undersigned begins by noting that, to the extent that Defendant is attempting to assert a stand-alone claim that the Government offered perjured testimony, he is barred from pursuing such a claim by the collateral review waiver provision of his plea agreement. However, to the extent that he also addresses a claim of ineffective assistance of counsel related to the admission of alleged perjured testimony, this court may review that claim.

At the sentencing hearing, the Government attempted to support the applicable loss calculations, in part, by presenting the testimony of Jerome Edward Russell, the owner of several companies involved in Defendant's scheme to defraud Brickstreet Mutual Insurance ("Brickstreet") and the West Virginia Workers Compensation

16

Commission ("Workers Comp") from approximately 2004-2005[3] through approximately 2011. Russell testified that Defendant, who audited his companies, would reduce the actual amount of premiums owed to Workers Comp and Brickstreet, and would charge the companies a percentage of the premiums saved as a kickback for doing so. (ECF No. 46 at 21-23). Russell estimated that the kickback was approximately 25% of the saved premium. (*Id.* at 24). Russell estimated that, over the eight to nine year time period that they engaged in the scheme, Defendant charged them "roughly a million" dollars. (*Id.* at 24-25).

Russell further testified, however, that when Allen Workman was prosecuted for similar conduct in the Western District of Virginia, Russell destroyed the books and records of his businesses and, thus, there are no accurate records to reconstruct such payments. (*Id.* at 25). Therefore, Russell testified to his recollection concerning estimates of cash payments made over the course of the scheme. Again, he estimated that he paid Defendant approximately one million dollars in cash payments and that he was ordered to pay four million dollars in restitution to Brickstreet and the State of West Virginia for his role in the fraud scheme. (*Id.* at 28-29).

On cross-examination, Mr. Giatras emphasized that Russell did not know the actual amounts given to Defendant and had no records to support his estimate of one million dollars. (*Id.* at 32). Mr. Giatras further thoroughly questioned Russell about specific payments he contended had been paid, the accuracy of his 25% estimate, and Russell's assertion that, at some point, they began paying Defendant in $1,500 weekly

---

[3] Russell's testimony indicated that the fraud scheme encompassed Workers Comp premium liability going back to 2003, with payments made in 2004. However, the stipulation of facts attached to Defendant's plea agreement indicates that Defendant was approached about falsifying premium audit information by Russell and Frelin Workman sometime in 2005.

installments instead of lump sum payments. (*Id.* at 34-41). Using a stipulation of facts that Russell had executed in his own criminal proceedings, Mr. Giatras further attempted to impeach Russell's testimony concerning when the $1,500 weekly payments began, and concerning other lump sum payments that were allegedly tied to a percentage of the premiums saved. (*Id.* at 42-59).

In addition to his examination by counsel, the district court also engaged in some questioning of Russell. (*Id.* at 64-72). The Government also presented evidence from spreadsheets that were seized from a safe in Defendant's home and a safe deposit box assigned to Defendant at Logan Bank & Trust. (*Id.* at 77-90). The parties stipulated to the accuracy of these records; however, Mr. Giatras argued that portions of these records dispute the accuracy of Russell's testimony concerning the payments he made to Defendant. (*Id.*)

Ultimately, the district court, having heard and considered all the evidence, made the following findings concerning the loss calculation:

> On the issue of loss, and for the purposes of the computation under the advisory United States Sentencing Guidelines, the loss being, of course, the fraudulent activities of the defendant that deprived first the state of West Virginia and then Brickstreet of lawfully due premiums, the Court finds by a preponderance of the evidence as follows: For the year 2000 in which an audit showed that R&W owed one-million in unpaid premiums to the state of West Virginia, the defendant was paid in 2004 a total of $175,000 to reverse the results of that audit fraudulently and thereby free R&W of the one-million dollar deficit.
>
> For the years 2004 and '5, the defendant enabled another of the companies of Frelin Workman and Jerome Russell to defraud the state of at least another $160,000, through similar fraudulent activities.
>
> For the four years, 2006 through 2009, the defendant was paid each year by companies operated by Frelin Workman and Jerome Russell of at least one-hundred-thousand dollars; consisting of $1,500 per week, for $78,000 per year, plus premium refunds, all to defraud Brickstreet of at least four

times that amount in unpaid premiums due for the companies owned by Workman and Russell, including Tug Valley and Aracoma.

That amounts to a total for those four years of $1,600,000.00.

The year 2010, the defendant was paid $1,500 weekly or $78,000, plus a refund of $30,000, and another $140,000 demanded by the defendant in 2011, aggregating $248,000, all to defraud Brickstreet of unpaid premiums owed by Aracoma for the year 2010, which premiums aggregated four times that amount, being $992,000. Brickstreet then is found to have been defrauded to the extent of $2,592,000 by Aracoma and other firms owned by Frelin Workman and Jerome Russell in the amounts as follows: The $1,600,000, the $992,000, which for Aracoma aggregates $2,592 -- I should say -- excuse me -- $2,592,000. That figure is added to the Christian Contracting sum agreed upon of $280,000; the T&W sum agreed upon of $154,527; and the sum agreed upon with respect to Newhall of $2,954,799.

The aggregate of those sums as to brick Street is $5,981,306.

As to the state of West Virginia, the amount is $1,160,000.

The total comes to, when the state of West Virginia, the $1,160,000 is included, a loss of $7,141,306.00.

(ECF No. 46 at 132-134). The loss amount was then used to determine Defendant's sentencing guideline level of 26. (*Id.* at 135).

Defendant now contends that Russell "continuously changed his story" while testifying under oath, and that Mr. Giatras "did nothing to protect him from this perjury or false testimony." (ECF No. 73 at 6-8). Defendant's briefs further assert that Mr. Giatras's cross-examination of Russell, while extensive, was insufficient to properly impeach Russell and to demonstrate that the loss amounts to which he testified were "made up." (ECF No. 73 at 11; ECF No. 93 at 4).

However, Defendant has offered no specific evidence to demonstrate that Russell's testimony, while somewhat inconsistent, was perjured. *See, e.g., Alonzo v. Untied States*, No. 2:02-cv-1456, 2006 WL 470605 (S. D. W. Va. Feb. 27, 2006) (Copenhaver, J.) (inconsistent testimony did not amount to perjury and counsel did not act deficiently in

19

failing to object thereto). The presiding District Judge, having heard all of the evidence, was able to judge Russell's credibility, and he made specific findings concerning the loss calculation, which Defendant has not called into doubt with any specificity in these post-conviction proceedings. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Defendant has not established that he is entitled to any collateral relief based upon how Mr. Giatras handled the evidence presented through Russell's testimony.

> ### C.    Alleged conflict of interest.

Defendant further asserts that, during his criminal proceedings, Judge Copenhaver was operating under a "clear conflict of interest" and that Mr. Giatras was ineffective for failing to address the alleged conflict with the court. Specifically, Defendant contends that his wife, who formerly worked for the Government Services Administration ("GSA"), had developed a personal relationship with Judge Copenhaver over the course of her employment. (ECF No. 73 at 10-11). Defendant further speculates that this alleged relationship "could have easily prejudiced the [Defendant] in the eyes of the court" and "may have played a role in the court's decision making at sentencing." (*Id.*) Therefore, Defendant contends that Mr. Giatras, who was allegedly aware of this perceived conflict of interest, erred in failing to address the issue prior to any proceedings taking place in this matter. (*Id.* at 11).

In support of this claim, Defendant offers an Affidavit from his wife, Elizabeth Sargent ("Mrs. Sargent"). (ECF No. 83, attachment to Addendum). The Affidavit confirms that Mrs. Sargent worked for GSA and was employed in the Charleston, West Virginia office beginning in October of 1992. The Affidavit further states that, in 1998, when the new courthouse opened in Charleston, Mrs. Sargent was tasked with overseeing

the move of furnishings and office items from the old courthouse to the new courthouse. Mrs. Sargent contends that Judge Copenhaver insisted that she personally pack and move his law library to his new chambers.  (*Id.* at 3).

Mrs. Sargent further contends that, subsequently, she gained responsibility for ensuring that the janitorial staff was adhering to their cleaning contract and for reporting of maintenance issues.  She further stated that she would check Judge Copenhaver's chambers early in the morning and that, when the judge was there, she would engage in conversations in his office with him on a regular basis.  (*Id.*)  Mrs. Sargent further contends that Judge Copenhaver invited her and her children to watch proceedings in his courtroom, and stated, "Judge Copenhaver and I were friends for many years during my employment with GSA."  (*Id.*)

Defendant's contention that the alleged personal or working relationship between his wife and Judge Copenhaver was an actual conflict of interest that affected the judge's impartiality during Defendant's criminal proceedings is speculative at best.  Title 28, United States Code, Section 455(a) provides, in pertinent part, that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a).  Subsection (b) thereof also mandates disqualification where a judge "has a personal bias or prejudice concerning a party. . . ." 28 U.S.C. § 455(b)(1).

The standard for determining disqualification is "whether another, not knowing whether or not the judge is actually impartial, might reasonably question his impartiality on the basis of all the circumstances."  *United States v. DeTemple*, 162 F.3d 279, 286 (4th Cir. 1998); *Aiken County v. BSP Division of Envirotech Corp.*, 866 F.2d 661, 679 (4th Cir. 1989).  This is an objective standard and recusal under section 455(b)(1) "is required only

if actual bias or prejudice is proved by compelling evidence." *Brokaw v. Mercer County*, 235 F.3d 1000, 1025 (7th Cir. 2000) (concluding that a reasonable person would not be convinced of bias based on judicial rulings alone). Defendant bears the burden of proving facts that recusal was justified. *DeNardo v. Municipality of Anchorage*, 974 F.2d 1200, 1201 (9th Cir. 1992).

Here, Defendant has not demonstrated that the alleged conflict of interest had any actual prejudicial effect on the outcome of his proceedings. Accordingly, even if Defendant could establish that Mr. Giatras's conduct in failing to address this issue or object to the assignment of Defendant's case to Judge Copenhaver was deficient, Defendant has not established the requisite prejudice to demonstrate a Sixth Amendment violation resulting therefrom. Therefore, the undersigned proposes that the presiding District Judge **FIND** that Defendant is not entitled to any collateral relief under section 2255 with regard to this claim.

## <u>RECOMMENDATION</u>

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **DENY** Defendant's Motion to Vacate, Set Aside, or Correct Sentence, pursuant to 28 U.S.C. § 2255 (ECF No. 73) and dismiss this civil action from the docket of the court.

The parties are notified that this Proposed Findings and Recommendations is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), Rule 8(b) of the Rules Governing Proceedings in the United States District Courts Under Section 2255 of Title 28, United States Code, and Rule 45(c) of the Federal Rules of Criminal Procedure, the parties shall have fourteen days (filing of

objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendations within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendations to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be served on the opposing party and Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendations, to mail a copy of the same to Defendant, and to transmit a copy to counsel of record.

February 7, 2018

Dwane L. Tinsley
United States Magistrate Judge